FILED

2004 JAN 26  P 12: 05

US DISTRICT COURT
BRIDGEPORT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TAMMY D. RICHARDSON<br>PLAINTIFF | CIVIL ACTION NO.:<br>3:00CV1062JCH |
| vs. | At: Bridgeport |
| METROPOLITAN DISTRICT COMMISSION, et al<br>DEFENDANTS | January 23, 2004 |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE

**I.    INTRODUCTION**

The Defendant, Metropolitan District Commission, (MDC), moves to exclude evidence on a number of issues. In the alternative, the Defendant requests that an offer of evidence concerning these issues be made outside the presence of the jury. The Plaintiff should be prevented from offering any testimony, remarks, arguments or questions concerning these areas until the Court has ruled.

Each area will be taken in turn.

**II.    ARGUMENT**

**A. The Plaintiff should be barred from offering any testimony concerning the Defendant Johnson's alleged alcohol use.**

The Plaintiff has identified several witnesses who will testify about the alleged use of alcohol by the Defendant Johnson. Plaintiff has not identified why

-2-

this evidence is relevant to her claims of race, sex, and/or religion discrimination. Any evidence related to alleged alcohol use by Defendant Johnson is not relevant and is not admissible. In the event that the Court finds that it may be relevant, the evidence is prejudicial to the Defendant and should be excluded on that basis.

**B. The Plaintiff should not be allowed to present evidence of alleged discrimination against other employees.**

The Plaintiff has identified numerous witnesses who will identify concerning alleged discriminatory treatment. These witnesses should only be allowed to testify if they have direct knowledge of the Plaintiff's claims. Any evidence concerning alleged discriminatory treatment by the MDC of other employees is not relevant, and should not be admitted. The following witnesses should not be allowed to offer this type of evidence:

1]. Curly Richards;

2]. Lebert Thomas;

3]. Donna Smith;

4]. Kendra Hewitt;

5]. Daisy Chavez;

6]. Paul Ritter;

7]. Trude Mero;

8]. Sal Gozzo;

-3-

9]. Phillip Kallaugher;

10]. Helmut Traichel;

11]. Richard Formica;

12]. Linda Ruggiero;

13]. Marty Godbout; and

14]. James Michel.

The testimony of the above witnesses should be limited to their direct knowledge concerning any discriminatory treatment of the Plaintiff. See Haskell vs. Kramer Corp., 543 F.2d 113 (1984). In addition, the Plaintiff identifies a witness in her Trial Memorandum, Raymond Mack, and has failed to describe the testimony of this witness. Given this failure to disclose the nature of the testimony, the Plaintiff should be barred from presenting any testimony from this witness.

### C. Any evidence concerning an attempted suicide by the Plaintiff should be excluded.

The Plaintiff stated the following in her Rule 26 damages analysis:

> Plaintiff's documented history of suicide attempts, depression and psychiatric treatment caused by the unlawful termination adequately supports the claim of extreme emotional distress here.

-4-

However, when the Plaintiff was questioned about her emotional and psychiatric condition and treatment in her deposition, the Plaintiff did not state that she attempted suicide <u>See Exhibit A, Richardson deposition</u> at 56-64.

Given the Plaintiff's deposition testimony, any evidence concerning an alleged suicide attempt should be excluded.

### III. CONCLUSION

Given the arguments stated above, the Defendant requests that the Motion in Limine be granted.

DEFENDANTS,

METROPOLITAN DISTRICT COMMISSION, et al

BY _____
ANTHONY J. PALERMINO
Their Attorney
Law Offices of Anthony J. Palermino, LLC
945 Wethersfield Avenue
Hartford, Connecticut 06114
(860) 296-0035
ct05651

-5-

## CERTIFICATION

**I HEREBY CERTIFY** that a copy of the foregoing was mailed, postage prepaid, on the 23rd day of January, 2004 to Attorney Paul M. Ngobeni, 914 Main Street, Suite 206, East Hartford, East Hartford, CT 06108.

ANTHONY J. PALERMINO

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2    TAMMY D. RICHARDSON      :  3:00CV1062JCH
      vs.                      :  AT HARTFORD
 3    METROPOLITAN DISTRICT    :  FRIDAY
      COMMISSION, ET AL        :  NOVEMBER 16, 2001
 4
      DEPOSITION OF:  TAMMY D. RICHARDSON
 5
      APPEARANCES:
 6
      LAW OFFICES OF PAUL M. NGOBENI
 7         Attorneys for the Plaintiff
           914 Main Street
 8         Suite 206
           East Hartford, CT  06108
 9         (860) 289-3155
      BY:  PAUL M. NGOBENI, ESQ.
10
      LAW OFFICES OF ANTHONY J. PALERMINO
11         Attorneys for the Defendant
           945 Wethersfield Avenue
12         Hartford, CT  06114
           (860) 296-0035
13    BY:  ANTHONY J. PALERMINO, ESQ.

14

15

16

17

18

19

20

21

22

23              Heather A. Pellerin, #00144
                Certified Shorthand Reporter
24           Registered Professional Reporter
                Certified Realtime Reporter
25
```

```
 1   that?
 2        A.   No.  Mr. LeBlanc was never -- he never had
 3   the time for such a thing.  It was a personnel issue.
 4        Q.   Did you go to him?
 5        A.   He was never around.  When I tried to go to
 6   him, when I did, it was personnel had to do it.
 7        Q.   How many times did you talk to him about
 8   this?
 9        A.   I don't remember.  It was more than three,
10   two or three, but he was never available.
11        Q.   You indicate that you're suffering from
12   emotional distress; is that correct?
13        A.   Yes, I am.
14        Q.   What treatment are you getting for
15   emotional distress?
16        A.   Right now I'm not seeing anyone because I
17   can't really afford to.
18        Q.   And when did you stop getting treatment for
19   emotional distress?
20        A.   Shortly after I left the district because
21   my benefits -- I no longer had the medical benefits
22   so I couldn't afford it.
23        Q.   So sometime in December of 1999?
24        A.   I would say, I don't know the exact time,
25   but Dr. Johnson would know, but it was shortly after
```

1  that because I didn't have the insurance to cover it.
2      Q.   And did you treat with anybody else besides
3  Dr. Johnson?
4      A.   For this, no, I did not.
5      Q.   Are you treating with anybody presently?
6      A.   Only Dr. Seigel for my back.
7      Q.   Do you have medical coverage at Northeast
8  Utilities?
9      A.   Yes, I do.
10     Q.   And does it cover treatment for emotional
11 illnesses?
12     A.   They do have policies or some formal
13 programs to that, however, I'm not taking advantage
14 of it because I don't have the extra money for the
15 copays right now.
16     Q.   And you indicated that you worked at
17 Northeast Utilities shortly after you left MDC; is
18 that correct?
19     A.   I started December 13th, 1999.
20     Q.   So from December 13th, 1999, through the
21 present time, you have received no treatment for
22 emotional illness; is that right?
23     A.   Yes.
24     Q.   And are you taking any medications for
25 emotional illnesses?

```
 1        A.    No.
 2        Q.    Were you ever taking any medications for
 3   emotional illnesses?
 4        A.    No.
 5        Q.    Did Dr. Johnson or anyone else up to
 6   December 13th, 1999, prescribe any medications for
 7   you for emotional illnesses?
 8        A.    No.
 9        Q.    Did you see anyone other than Dr. Johnson
10   for emotional illnesses up to December 13th, 1999?
11        A.    No.  Whenever I get stressed I just talk to
12   my friends, cry.
13        Q.    Have you ever been treated for emotional
14   illnesses during your employment at the MDC?
15        A.    Yes, Dr. Johnson.
16        Q.    Okay.  Other than Dr. Johnson, no?
17        A.    No.
18        Q.    How about prior to your employment with the
19   MDC, have you ever been treated for emotional
20   illnesses?
21        A.    I do have to answer that?  Repeat that,
22   please?
23        Q.    Have you ever been treated for emotional
24   illnesses prior to February 26th, 1996?
25        A.    Yes.
```

5

| | |
|---|---|
| 1 | Q. And when was that? |
| 2 | A. This was when, early 1990, early '90s. I |
| 3 | don't know the exact date. |
| 4 | Q. What were you treated for? |
| 5 | A. I would prefer not to say that because it |
| 6 | has nothing to do with my job. |
| 7 | Q. It's a legitimate question. |
| 8 | A. It had to do with me being in an abusive |
| 9 | situation. |
| 10 | Q. An abusive personal situation? |
| 11 | A. Yes. |
| 12 | Q. What type of treatment did you receive? |
| 13 | A. I just went to counseling. |
| 14 | Q. And who was the counselor that you went to? |
| 15 | A. Her name was Mary Battle. |
| 16 | Q. Where is she located, if you know? |
| 17 | A. She's now deceased, but she was located in |
| 18 | Bloomfield. |
| 19 | Q. And what type of counseling did she |
| 20 | provide? |
| 21 | A. I went to her weekly and we just talked. I |
| 22 | just -- it was more or less just talking. |
| 23 | Q. Was she a medical doctor? |
| 24 | A. She had license to do -- she was. |
| 25 | Q. A psychologist? |

```
 1         A.    Yes.
 2         Q.    And was this emotional treatment or
 3   psychiatric-type treatment?
 4         A.    It was helping me to deal with the fact
 5   that -- it was helping me to deal with a personal
 6   issue involving my daughter and my -- her father.
 7         Q.    Did she prescribe any medications for you?
 8         A.    I took Zoloft for approximately one day and
 9   I didn't like the way that -- I didn't do that.
10         Q.    Did she prescribe anything?
11         A.    That, the Zoloft.  She prescribed that.
12         Q.    And after you stopped taking it did she
13   prescribe anything else?
14         A.    She wanted me to try other medications but
15   I was too afraid.
16         Q.    And how long did you treat with her?
17         A.    A few months.
18         Q.    A few months in 1990?
19         A.    It was early '90s.  I don't remember the
20   exact days, it was just early '90s.  My daughter was
21   young.
22         Q.    Other than that time treating with this
23   woman --
24         A.    Mary Battle.
25         Q.    -- have you had any other type of
```

```
 1   psychiatric or emotional illness treatment?
 2        A.   During the time with her?
 3        Q.   Other than the time with her?
 4        A.   Oh, I had to do something regarding, like I
 5   said, an abusive situation prior to that.  I had to
 6   also do that, yes, I did.
 7        Q.   And who did you treat with then?
 8        A.   I don't remember.
 9        Q.   Were you hospitalized then?
10        A.   Oh, no, I was never hospitalized.
11        Q.   Did you treat with a psychiatrist?
12        A.   I'm not sure.  I don't know if he's
13   considered a psychiatrist.  This was after high
14   school.
15        Q.   Did you take any, or were you prescribed
16   any medications --
17        A.   No.
18        Q.   -- for your emotional illness?
19        A.   No.
20        Q.   Do you know how long that treatment
21   occurred?
22        A.   A few months.
23        Q.   A few months?
24        A.   Yeah.  It was never anything long term.
25        Q.   And about what years were you in high
```

```
 1   school so we can kind of narrow it down?
 2       A.   '82 through '86.
 3       Q.   Okay.  So sometime between 1982 and 1986
 4   you were treated by a professional counselor for an
 5   abusive relationship again?
 6       A.   Yes.  It wasn't a relationship, it was a
 7   household --
 8       Q.   And then thereafter, sometime in the early
 9   1990s you treated with Ms. Battle?
10       A.   Um-hmm, yes.
11       Q.   And then nothing until you went to see
12   Dr. Johnson, correct?
13       A.   Right.
14       Q.   And then you finished seeing Dr. Johnson
15   shortly after your December 7th resignation from MDC?
16       A.   January, February, I don't remember the
17   exact dates, but yeah.
18       Q.   Within a few months?
19       A.   Yeah, within a few months.
20       Q.   This has been provided to us today.  Could
21   you take a look at that and identify it for us,
22   please.
23       A.   It's my 2000 tax return.
24       Q.   Whose 2000 tax return?
25       A.   My 2000 tax return.
```

```
1        Q.    And you have looked it over?
2        A.    Yes.
3        Q.    And you identified that as being your 2000
4   tax return?
5        A.    Yes.
6              MR. PALERMINO:  Can we mark that.
7              (Defendant's Exhibit 14, 2000 Tax Return,
8              Marked for Identification)
9              MR. NGOBENI:  Those are the originals.  I
10             would like to have them back.  I will give them
11             to you to make copies.
12             MR. PALERMINO:  Attorney Ngobeni and I
13             have documents that we'd like to identify as an
14             exhibit, and these are documents that were
15             subpoenaed by an attorney in the personal injury
16             matter involving Ms. Richardson which consists
17             of her Metropolitan District Commission
18             personnel file and some medical information that
19             was contained therein?
20             MR. NGOBENI:  Correct.
21             MR. PALERMINO:  We both agree that we will
22             mark that as Exhibit 16.
23             (Defendant's Exhibit 16, MDC File, Marked
24             for Identification)
25       Q.    (By Mr. Palermino)  Ms. Richardson, you
```

```
 1    indicated that you still occasionally treat for your
 2    automobile accident condition, correct?
 3         A.   Yes.
 4         Q.   Since you have been at Northeast Utilities
 5    have you had any occasion to treat for emotional
 6    illness issues?
 7         A.   No.
 8         Q.   No?
 9         A.   No.
10              MR. PALERMINO:  I believe I have nothing
11         further at this moment.
12              MR. NGOBENI:  You're done?  For the day?
13              MR. PALERMINO:  It looks like it.  Do you
14         have questions?
15              MR. NGOBENI:  That's the most efficient
16         deposition I have seen in a long, long
17         time.  Yes, I do have questions.
18
19         CROSS-EXAMINATION BY MR. NGOBENI:
20
21         Q.   Ms. Richardson, turning your attention to
22    Defendant's Exhibit 12, now, I just wanted to get
23    some verification from you, on Defendant's Exhibit 12
24    it states that you had, essentially, two things,
25    first the meeting of July 26th, 1999?
```